**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**HAROLD GENE BAILEY,**

     **Plaintiff,**

v.                             **Case No.: 2:16-cv-07044**

**NANCY A. BERRYHILL[1],
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

     This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the court are Plaintiff's Brief in Support of Motion for Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision. (ECF Nos. 11, 14).

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Acting Commissioner of the Social Security Administration, Nancy A. Berryhill, is substituted for former Acting Commissioner Carolyn W. Colvin as Defendant in this action.

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **GRANTED**, to the extent it seeks remand; the Commissioner's request for judgment on the pleadings be **DENIED;** the Commissioner's decision be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this PF&R; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On December 31, 2012 and January 3, 2013, respectively, Plaintiff Harold Gene Bailey ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of April 14, 2006, which he later amended to April 14, 2007,[2] (Tr. at 333, 335, 337), due to "Osteoprosis [*sic*] (bones fragiil [*sic*], crack easy); 3 counts of post dramitic [*sic*] stress disorder [posttraumatic stress disorder, "PTSD"]; mental illness (bipolar, manic clinical depressio [*sic*], see list); nerve damage to left hand and wrist; sleep apnea-Stop breathing in sleep; muti [*sic*] mini strokes affecting memory and left side; deterating [*sic*] discs in back; 9 tumors and polyps removed from colon; have cataracts; [and] Glaucoma (going blind)." (Tr. at 367). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 194, 199, 207, 210). Claimant filed a request for an administrative hearing, which was held on December 12, 2014, before the Honorable Toby J. Buel, Sr., Administrative Law Judge ("ALJ"). (Tr. at 95-129). By

---

[2] Claimant previously filed for DIB and SSI in 1987, alleging an onset date of July 15, 1985. The applications were denied initially on November 24, 1987 and upon reconsideration on March 10, 1988. Claimant filed for SSI on April 11, 1999, alleging an onset date of March 1, 1993. This application was initially denied on December 28, 1999. On June 27 and 28, 2007, respectively, Claimant filed for DIB and SSI, alleging an onset date of April 14, 2007. The claims were initially denied on August 24, 2007 and again upon reconsideration on January 11, 2008. On May 11, 2011, Claimant filed for DIB and SSI alleging an onset date of April 14, 2007. The claims were denied initially on July 14, 2011. (Tr. at 72).

written decision dated February 10, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 72-87). The ALJ's decision became the final decision of the Commissioner on June 7, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 9, 10). Claimant then filed a Brief in Support of Motion for Judgment on the Pleadings. (ECF No. 11). In response, the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 14), to which Claimant filed a reply memorandum. (ECF No. 16). Consequently, the matter is fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 42 years old at the time of the alleged onset of disability and 50 years old at the time of the ALJ's decision. (Tr. at 85, 104). He has a high school education, completed two years of college, and communicates in English. (Tr. at 107, 366, 368). Claimant previously worked as a surveyor, sales person, and tax preparer. (Tr. at 369).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any

step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful activity. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform

an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2012. (Tr. at 75, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since April 14, 2007. (Tr. at 75, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "osteoporosis; reduced visual acuity, cataracts; and seizures." (Tr. at 75-79, Finding No. 3). The ALJ considered Claimant's other medically determinable impairments, but concluded that they were non-severe because they did not cause a significant limitation in Claimant's ability to perform basic work activities. (*Id.*). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 79-81, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). He can occasionally to frequently lift 10 pounds. He can stand/walk about 6 hours and sit about 6 hours, both in an 8-hour workday. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl, but may never climb ladders, ropes, or scaffolds. He must avoid concentrated exposure to temperature extremes, fumes, odors, dust, wetness, humidity, and vibration, as well as even moderate exposure to heights, machinery, and hazards. He is afflicted with chronic pain noticeable to himself at all times, but could maintain attention and concentration in two-hour increments.

(Tr. at 81-85, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 85, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in

combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 85-87, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1964, and was defined as a younger individual age 18-49; however, Claimant subsequently changed age category to closely approaching advanced age; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 65-86 Finding Nos. 7-9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a vacuum tester, agricultural cleaner, or table worker at the unskilled, light exertional level. (Tr. at 86-87, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 87, Finding No. 11).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant presents two challenges to the Commissioner's decision, both of which involve the ALJ's assessment of Claimant's visual impairments. First, Claimant contends that the ALJ erred at step three of the sequential evaluation when he concluded that Claimant did not have an impairment or combination of impairments that met or equaled a listed impairment. (ECF No. 11 at 11-14). Specifically, Claimant argues that the ALJ incorrectly relied upon opinions of agency experts that pre-dated medical records documenting the nature and severity of Claimant's visual impairments. In addition, Claimant asserts that the ALJ misstated the opinion of medical expert, Judith Brendemuehl, M.D., who testified at the administrative hearing that she could not offer

an opinion as to whether Claimant's loss of visual fields met or equaled a listing because she did not have all of the necessary information. Lastly, Claimant maintains that the ALJ failed to compare Claimant's visual impairments to the criteria of the most relevant listing. According to Claimant, the ALJ examined the criteria of Listing 2.02, which addresses a loss of central vision, but failed to consider Listing 2.03, which was the proper listing under which to assess contraction of Claimant's visual fields.

For his second challenge, Claimant contends that the ALJ did not provide an adequate explanation for his RFC finding. (ECF No. 11 at 14-17). Relying on recent decisions by the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit"), Claimant argues that the ALJ should have conducted a function-by-function assessment of Claimant's limitations and provided citations to the record in support of his determination that Claimant's RFC did not include visual limitations. Claimant indicates that the ALJ failed to "build an accurate bridge from the evidence to his conclusion," as required by the Fourth Circuit in *Monroe v. Colvin,* 826 F.3d 176, 189 (4th Cir. 2016).

## V.    <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the court, except for evidence offered by Claimant after the ALJ's decision, which was not incorporated into the record by the Appeals Council. The information most relevant to the issues in dispute is summarized as follows:

### A. Treatment Records

On September 3, 2006, Claimant underwent a CT scan of his head at Logan General Hospital due to confusion and headache. (Tr. at 875). The results were unremarkable.

On August 8, 2007, Claimant's primary care physician, Dr. Robert Perez,

performed a physical examination of Claimant at the request of the West Virginia Department of Health and Human Resources. (Tr. at 608-09). As part of the examination, Dr. Perez measured Claimant's visual acuity. Claimant's distant vision without glasses was 20/200 in both eyes, and with glasses, was 20/30 in his right eye and 20/40 in his left eye. His eyes otherwise appeared to be normal.

Claimant presented to Mason White, O.D., on October 7, 2008 for an eye examination. (Tr. at 564-65, 575-76). Claimant had been referred to Dr. White by Dr. Perez, who was concerned that Claimant's diabetes mellitus might be affecting his vision. Dr. White performed a review of systems, focused heavily on the eyes. Claimant reported no loss of vision or side vision, but stated that he had double vision, blurred vision, distorted vision, light sensitivity, flashes/floaters, and tired eyes. On examination, Claimant did not appear to have any visible retinopathy and his visual fields were normal on confrontation testing. As Claimant's eyeglass prescription had not been updated for years, Dr. White performed visual acuity testing and provided Claimant with a new prescription. Dr. White also planned to order baseline photographs for subsequent comparison in order to identify any future visual changes related to Claimant's diabetes mellitus.

On October 26, 2009, Claimant was examined by Chaohua Yan, M.D., a neurologist, for a pre-surgery clearance. (Tr. at 473-76). Claimant reported a history of diabetes, seizure disorder, asthma, hypertension, chronic obstructive pulmonary disease, sleepwalking, depression, anxiety, panic attacks, and PTSD. He stated that an EEG done approximately twenty-five years earlier was inconclusive for epilepsy. He had never seen a neurologist, nor been prescribed anti-epileptic medication. Claimant indicated that he was disabled due to chronic neck and back problems. While he listed a number of physical

8

and emotional ailments on a review of systems, he made no specific complaints related to his eyesight. As part of the neurological work-up, Dr. Yan examined Claimant's visual fields with confrontation testing. He found Claimant's visual fields to be full and his visual acuity to be within normal limits. Claimant's fundi through un-dilated pupils showed no abnormal pigmentation, and the discs were normal in color, size, and shape with no venous engorgement. Claimant's pupils were equally round, reactive to light and nearness. The extraocular muscles were intact without nystagmus. Dr. Yan ordered an EEG, as well as a MRA and MRI of the head. The EEG was performed on November 2, 2009 and reflected normal results. (Tr. at 481).  The MRA and MRI of Claimant's head were performed on November 12, 2009 and were likewise interpreted as normal. (Tr. at 484-87).

On July 11, 2011, Claimant presented to Lonnie Lucas, O.D., for an eye health check secondary to Claimant's diagnosis of diabetes mellitus. (Tr. at 573-74). Claimant's visual fields were measured confrontationally and were found to be normal in both eyes. With correction, Claimant's visual acuity measured 20/30 in the right eye and 20/25 in the left eye. He was assessed with blepharitis (inflammation of the eyelids), meibomian gland dysfunction (dry eyes), nuclear sclerotic cataract, and diabetes mellitus without retinopathy.

Claimant presented to Mason White, O.D., on October 2, 2012 complaining of problems with glare while driving, made worse with headlights and wet roads. (Tr. at 566-68). Claimant had no physical ocular complaints or reports of routine headaches, double vision, visual floaters, or light flashes. However, he did complain of a noticeable decline in his vision that had occurred gradually and was experienced in all ranges. On examination, Claimant's visual acuity unaided by correction measured 20/400 in distant

9

vision acuity ("DVA") in both eyes and 20/60 in near vision acuity ("NVA") in both eyes. With Claimant's current eyeglass prescription, his DVA measured 20/40 in both eyes and NVA measured 20/70 in both eyes. With final correction, both DVA and NVA in both eyes measured 20/30. A computerized visual field screening test was administered and reflected that Claimant's visual fields were full in all quadrants bilaterally. Claimant's external eye examination was normal and his extraocular muscle motilities and versions were full. On slit-lamp examination, Claimant's corneal epithelium, stroma, and endothelium were clean and healthy. His bulbar and palpebral conjunctivae were healthy and white, and the chambers were deep and free of cells and flare. Claimant's irises were healthy, showing normal anatomy and convexity. The lens, both capsules, and cortex were normal for Claimant's age. Claimant's lens nucleus showed clouding and sclerosis, with some opacification. His vitreous bodies were clear and fully attached, and he had healthy maculae, nerve heads, and peripheral retinal structures. Examination of the retinas revealed blood vessel attenuation. Claimant was assessed with combined cataract, bilateral; hypertensive retinopathy; myopia; astigmatism; and presbyopia. Dr. White issued a temporary adjustment to Claimant's eyeglass prescription and counseled him on the importance of seeking treatment for his underlying systemic conditions. Claimant returned to Dr. White on January 2, 2013; however, the medical record contains very little information regarding this visit. There is a hand written reference to "crinkled chrome foil" in the right visual field. (Tr. at 569-70).

Claimant sought treatment with Dolores Santamaria, M.D., for seizures and mini-strokes on March 26, 2013. (Tr. at 782-84). Claimant reported a history of glaucoma and cataracts. As part of the neurological examination, Dr. Santamaria made the following findings: Claimant had clear optic discs, no evidence of papilledema, full visual fields, and

intact extraocular muscles with nystagmus. Claimant was assessed with transient ischemic attack, seizure, sleep disorder, back pain, and stroke. Claimant was provided a prescription for Neurontin.

Claimant returned to Dr. Santamaria on May 3, 2013 complaining of vision loss. (Tr. at 779-81). Claimant reported that his symptoms started one year earlier and were getting worse. He advised Dr. Santamaria that he had seen an eye doctor, who diagnosed him with bilateral hemianopsia,[3] glaucoma, and cataracts. On examination, Claimant had clear optic discs with no evidence of papilledema. His visual fields were impaired bilaterally, but extraocular muscles were intact without nystagmus. Claimant was assessed with vision loss and seizures. Dr. Santamaria ordered an MRI to rule out occipital stroke and increased Claimant's Neurontin.

Claimant returned to Dr. Santamaria on July 17, 2013, November 18, 2013, and May 19, 2014 for treatment of seizures. (Tr. at 772-78). At all three visits, Dr. Santamaria recorded that Claimant was doing much better with no new seizures. Dr. Santamaria noted on July 13 that the MRI of Claimant's head performed in May showed no evidence of acute stroke. By his November 19 examination, Claimant was noted to be "seizure free" with the continued use of Neurontin. At his May 19, 2014 visit, Dr. Santamaria found no new seizure activity, remarking that Claimant was doing "overall good." Claimant made no complaints regarding his vision, nor did Dr. Santamaria document any vision examinations at these visits.

On January 29, 2014, Claimant presented to Michael B. Beres, M.D, for an eye examination. (Tr. at 682-85, 800-03). Claimant complained of vision that "looks like

---

[3] Hemianopia, or hemianopsia, is "defective vision or blindness in half of the visual field of one or both eyes; loosely, scotoma in less than half of the visual field of one or both eyes." Dorland's Medical Dictionary for Health Consumers. © 2007 by Saunders, an imprint of Elsevier, Inc.

black chrome, colored spots," in both eyes that occurred a few times per day lasting up to thirty minutes. Claimant reported that this visual disturbance had been ongoing for the past two years but had gotten worse in his right eye. He rated the severity as occasionally reaching seven on a 10-point scale. With correction, Claimant's visual acuity measured 20/40 in both eyes. His pupils were equal, round, and reactive to light and accommodation. Both superior and inferior palpebral conjunctivae were clear bilaterally. His lid margins were 3+ collerettes and meibomian inspissation. The cornea was clear in both eyes, unremarkable, and with intact epithelium. The lens examination revealed 1+ nuclear sclerotic cortical cataract in both eyes. The optic nerve was 0.4 sharp with healthy nerve fiber layer and rim in both eyes. There were several vitreous floaters with strands and syneresis in both eyes. His maculae were flat and within normal limits. The vessels were within normal limits, and the periphery of both eyes was flat and within normal limits. On confrontation testing, Claimant's visual fields were full in both eyes. A formal visual field test was performed to rule out CVA and glaucoma, the results of which showed non-diagnostic scotoma.

Dr. Beres assessed Claimant with blurred vision due to early cortical cataracts; however, Dr. Beres believed the cataracts were not at the stage that required surgical intervention. Claimant was also assessed with "other specified visual disturbances," diabetes mellitus, benign essential hypertension, open angle with borderline glaucoma findings, vitreous degeneration, and other vitreous opacities. Dr. Beres did not find any sign of hypertensive retinopathy or retinal detachment. He scheduled an appointment for Claimant with Dr. Charlton at West Virginia University to evaluate Claimant's report of intermittent scotoma, which was most likely due to migraine headaches, and to follow-up on the non-diagnostic scotoma found on the formal visual field test. Dr. Beres also

instructed Claimant to return in five months, after his visit with Dr. Charlton.

Claimant presented to Judie Charlton, M.D., at West Virginia University Eye Institute on March 6, 2014. (Tr. at 711-12). Dr. Charlton documented that Claimant had been referred by Dr. Beres for incongruous visual field deficits that were suspicious, because Claimant's right eye respected the midline with macular sparing. Dr. Beres was also concerned about glaucoma. Claimant reported that two years prior, while driving, he experienced an acute right eye, right-sided visual disturbance that caused him to stop the car until the disturbance had subsided. Since that incident, Claimant had noticed slowly decreasing vision in his right eye at the right side, as well as intermittent visual disturbances described as having a "crinkled black chrome" appearance. Although Claimant had visual changes in the past with migraine headaches, he indicated that his recent visual disturbances were not associated with headaches. Claimant also reported having a longstanding seizure disorder, a twenty-year history of diabetes mellitus, and a history of two strokes. Dr. Charlton did not document examination findings; however, she diagnosed Claimant with diabetes; colon cancer; stroke; seizures; myocardial infarction (old); migraine aura without headache; visual field defect, heteronymous bilateral, probably due to prior cerebral vascular accident ("CVA"); and suspect glaucoma, very low risk. Claimant was advised to follow up with Dr. Beres for a repeat visual field study in order to determine if his right-sided visual field defect could be reproduced. Dr. Charlton opined that Claimant was at low risk for glaucoma as evidenced by the normal results from the pachymetry test, the lack of abnormal intraocular pressures, and his small cup-to-disc ratio.

On August 6, 2014, Claimant returned to Dr. Beres for follow up and for a repeat visual field test. (Tr. at 686-88). Claimant complained of blurred vision in both eyes with

a slightly progressive halo and glare, describing the severity as three out of ten. On examination, his visual acuity with correction was 20/40 in both eyes. Claimant's pupils were equal, round, and reactive to light and accommodation. His eyes had a full range of motion. His superior and inferior palpebral conjunctivae were clear in both eyes. The lid margins were 3+ collerettes and meibomian inspissation. Claimant's cornea was clear in both eyes, unremarkable, and with intact epithelium. A lens examination revealed 1+ nuclear sclerotic cortical cataract in both eyes. The optic nerve was 0.4 sharp with healthy nerve fiber layer and rim in both eyes. There were several vitreous floaters with strands and syneresis in both eyes. His maculae were flat and within normal limits. The vessels were within normal limits, and the periphery of both eyes was flat and within normal limits. Claimant's visual fields were full bilaterally on confrontation testing. A formal visual field test was repeated and showed no glaucoma pattern or progression.

Claimant was assessed with other and combined forms of senile cataracts, other specified visual disturbances, and open angle with borderline glaucoma findings. Dr. Beres opined that Claimant's blurred vision was due to early nuclear sclerotic cataracts in both eyes. In light of Claimant's history of myocardial infarction and coronary artery disease, Dr. Beres suspected Claimant's fixed vision loss was related to a prior cortex CVA. Claimant was advised to return yearly in order to check for signs of glaucoma.

A copy of Claimant's August 2014 Humphrey visual field test printout was subsequently produced by Dr. Beres, but the copy quality is poor, rendering the document largely illegible. (Tr. at 822-24). Nevertheless, the grid of the right eye appears to show a temporal hemianopia with spared central vision, while the grid of the left eye appears to show a constricted visual field involving the entire perimeter of the eye. In light of Claimant's statement that he "did not do a good job on the left eye," that finding might be

interpreted as non-diagnostic. (*Id.*). Because the document is such a poor copy, reliability data is not discernible.

In December 2012; February, April, June, July, September, and November 2013; and January, March, May, July, and October 22, 2014, Claimant complained to Dr. Perez about floaters, glaucoma, and cataracts; however, on each occasion, Dr. Perez's external examination revealed no obvious abnormalities. (Tr. at 713-46).

After the ALJ's decision, Claimant submitted additional medical records for review by the Appeals Council including, in part, records from Lincoln Primary Care and Michael Beres, M.D. (Tr. at 9-21, 41-43). However, the Appeals Council refused to incorporate the records into evidence, explaining that they were prepared after the ALJ's decision and, therefore, "constituted new information … about a later time." (Tr. at 2).

### B. Evaluations and Opinions

On July 16, 2007, Roger C. Baisas, M.D., completed a Social Security Disability Evaluation of Claimant. (Tr. at 440-45). Claimant's chief complaints were "diabetes, sleep disorder, neck and spinal shock trauma, bulging disc in thoracic area, problems in both legs, damage to left leg, easily confused, massive headaches, dyslexic, and slow learner." (Tr. at 440). Claimant stated he was a sales associate at Lowe's for five years, but was fired on April 6, 2007 after a customer complained about him. As part of the examination, Dr. Baisas administered a Snellen eye test, which showed that Claimant had 20/20 vision in both eyes with glasses. (Tr. at 442).

Curtis Withrow, M.D., prepared a Physical Residual Functional Capacity Assessment form on July 13, 2011, noting that Claimant did not return the completed forms and there was insufficient evidence to establish the physical residual functional capacity. (Tr. at 502-9). On February 11, 2013, Narendra Parikshak, M.D., completed a

15

Physical Residual Functional Capacity Evaluation, finding that Claimant had no visual limitations. (Tr. at 138-41). On August 22, 2013, Porfirio Pascasio, M.D., completed a Physical Residual Functional Capacity Assessment, evaluating Claimant's condition through his date last insured of December 31, 2012. He also completed a second assessment form to reflect Claimant's current RFC. (Tr. at 161-65). With respect to the first assessment, Dr. Pascasio's findings were identical to those of Dr. Parikshak. However, as to Claimant's current RFC, Dr. Pascasio agreed with most of Dr. Parikshak's findings, but opined that Claimant should avoid even moderate exposure to hazards such as machinery and heights.

### C. Other Evidence Regarding Claimant's Visual Deficits

On January 15, 2013, Claimant provided an Adult Function Report to the SSA. (Tr. at 385-92). He claimed to have "migraines in [his] eyes" and "black spots [that] move blocking [his] vision." (Tr. at 385). For hobbies, Claimant played Pacman, watched television, and played with Legos. (Tr. at 386). He stated that glaucoma affected his ability to see clearly. (Tr. at 390).

On August 19, 2013, Claimant submitted a second Function Report. (Tr. at 405-13). Claimant reiterated that he had vision problems, (Tr. at 406), stating that he had glaucoma and did not see well. (Tr. at 412). However, he admitted that he still drove a car. (Tr. at 409).

At the administrative hearing held on December 12, 2014, Claimant testified that he drove to the Social Security office in his dad's truck. (Tr. at 105-06). He estimated that he drove about 100 miles per week. (Tr. at 107). Claimant stated that he played Pacman two to three hours per day, watched some television, and drew. (Tr. at 109-10).

Dr. Judith Brendemuehl, a medical expert, testified at the hearing upon the request

of the ALJ. (Tr. at 112-16). Dr. Brendemuehl began by discussing Claimant's medical history, noting that while some of his symptoms were consistent with a stroke or transient ischemic attack, the objective medical studies did not support such a diagnosis. Dr. Brendemuehl felt there were a couple of pieces of information that were significant, however. First, she pointed to Claimant's examination by Dr. Charlton, which resulted in a diagnosis of heteronymous hemianopia. (Tr. at 113). According to Dr. Brendemuehl, that diagnosis meant that Claimant had visual field defects in the same half of each eye, in this case temporal to temporal, with the primary involvement being the temporal side of the right eye. Dr. Brendemuehl expressed surprise that Claimant could drive with such a reduction of his visual field, although she indicated that his visual acuity was 20/40, and that acuity facilitated his driving. (Tr. at 113-14). She added that Claimant had blurred vision due to immature cataracts and occasionally experienced black, chrome-like visual disturbances thought to be connected with migraine headaches. Dr. Brendemuehl was not able to provide an opinion on whether Claimant's visual field loss met or equaled a listed impairment, because the visual field grids were not available in the record at that time. However, Dr. Brendemuehl opined that Claimant's vision was "his biggest limitation." (Tr. at 115). She explained that Claimant would not be able to "change direction, turn his head from side to side, and see things clearly." (*Id.*). He would need to do most of his work straight ahead, due to the loss of peripheral vision. At the conclusion of the hearing, the ALJ asked Plaintiff's counsel to provide the visual field studies "that should have accompanied" Dr. Charlton's evaluation. (Tr. at 128).

## VI.    **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial

evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

Both of Claimant's challenges involve the ALJ's alleged failure to properly consider Claimant's loss of visual fields. As evidenced by the written decision and as explained in more detail below, the ALJ improperly conflated two distinct visual impairments: loss of visual acuity and loss of visual field. As a result, the ALJ erred by failing to perform an adequate analysis of the evidence pertaining to Claimant's visual field loss. Given the unresolved contradictory evidence regarding the severity and functional impact of Claimant's visual field loss, the undersigned **FINDS** that the Commissioner's decision is not supported by substantial evidence. Thus, the case should be remanded for further assessment of Claimant's visual limitations.

The record shows that Claimant has multiple conditions, which could affect his vision; including, immature cataracts, intermittent visual disturbances likely related to migraine headaches, borderline glaucoma, nearsightedness, farsightedness, astigmatism, and visual field defects. The first six conditions can impair Claimant's visual acuity, while the visual field defects may interfere with his peripheral vision. Visual acuity is the "[s]harpness of vision, especially as tested with a Snellen chart. Normal visual acuity based on the Snellen chart is 20/20."[4] Visual field, on the other hand, is "the area of physical space visible to an eye in a given position. The average VF is 65 degrees upward, 75 degrees downward, 60 degrees nasally, and 90 degrees temporally."[5] Loss of visual acuity and loss of visual field are recognized as separate impairments by the SSA, associated with different functional limitations. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, ¶ 2.00 (A)(1) ("Visual disorders are abnormalities of the eye, the optic nerve, the optic tracts, or the brain that may cause a loss of visual acuity or visual fields. A loss of visual acuity limits your ability to distinguish detail, read, or do fine work. A loss of visual fields limits your ability to perceive visual stimuli in the peripheral extent of vision.") Both visual acuity and visual fields affect an individual's eyesight, and a significant limitation of either, or a combined limitation of both, can result in a finding of disability under Social Security regulations. *Id.* at ¶ 2.00.

In this case, the ALJ first addressed Claimant's visual limitations at the second step of the sequential process, finding "reduced visual acuity, cataracts" to be a severe impairment. Whether or not the ALJ considered the severity of Claimant's visual field deficits as a separate impairment is uncertain. However, the perplexing discussion that

---

[4] American Heritage® Medical Dictionary Copyright © 2007, 2004 by Houghton Mifflin Company.

[5] Mosby's Medical Dictionary, 9th edition. © 2009, Elsevier.

follows the step two finding strongly suggests that the ALJ did not appreciate a distinction between visual acuity loss and visual field loss. For example, the ALJ relied in large part on Claimant's diagnosis of heteronymous hemianopia to explain the step two finding. (Tr. at 75). The ALJ acknowledged Dr. Charlton's diagnosis of this disorder and referred to Dr. Brendemuehl's testimony that such a condition "means your field of vision is cut in half." (Tr. at 75). He also discussed the August 2014 visual field grids supplied by Dr. Beres, concluding that they were consistent with Dr. Charlton's findings. (*Id.*). Although all of this evidence relates exclusively to Claimant's visual fields, the ALJ made ***no*** severity finding related to Claimant's visual field loss. Instead, he cited to this evidence, as well as evidence that Claimant had blurred vision due to immature cataracts and migraine headaches, in support of his finding related to visual acuity loss.

At the next step of the sequential process, the ALJ compared the severity of Claimant's impairments to the Listing, stating that Dr. Brendemuehl did not find Claimant's impairments to meet or equal any listed impairment, an opinion given great weight by the ALJ. (Tr. at 80). However, as Claimant points out, Dr. Brendemuehl did not provide such a clear-cut opinion in relation to Claimant's loss of visual field. To the contrary, Dr. Brendemuehl testified that she could not "meet or equal it to a listing, because I just don't have the visual field grid to be able to talk about." (Tr. at 115). Significantly, the ALJ obtained a set of visual field grids associated with Claimant's August 2014 testing, but did not supply the grids to Dr. Brendemuehl or request a supplemental opinion on whether the visual field loss seen on the grids met a listed impairment. Instead, the ALJ looked only at Claimant's visual acuity, comparing Snellen test results to Listing 2.02 and concluding that Claimant did not satisfy the criteria of the listing,

because "the remaining vision in the better eye after best correction is 20/200 or less." (Tr. at 81).

In determining Claimant's RFC, the ALJ again discussed Claimant's visual impairment, relying primarily on evidence pertaining to Claimant's visual acuity. The ALJ reviewed various treatment records documenting Snellen tests, which showed Claimant's visual acuity to be in the range of 20/20 to 20/40. (Tr. at 83). The ALJ also noted that Claimant could drive and play video games for several hours a day, which the ALJ offered as proof that Claimant had "adjusted" to his visual deficits. (Tr. at 83, 85). Although the ALJ considered Dr. Brendemuehl's opinions that Claimant's visual field impairment was his "biggest limitation"; that it prevented him from rapidly turning his head from side-to-side; and that it required Claimant to do most of his work "straight ahead", the ALJ ultimately discounted these opinions in favor of the opinions offered by the state agency consultants, who found that Claimant had no visual limitations. (Tr. at 85).

Looking first at Claimant's criticism of the ALJ's step three determination, the undersigned agrees that the ALJ did not conduct a proper analysis of all of the relevant listed impairments. A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments that [the SSA] consider[s] to be severe enough to prevent a person from doing any gainful activity regardless of his or her age, education, or work experience." *See* 20 C.F.R. §§ 404.1525, 416.925. Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). If the claimant is unable to demonstrate that his impairments, alone or in combination, match

21

the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

In this circuit, "where there is factual support that a listing could be met," the ALJ must consider whether the claimant's impairment meets or equals the relevant listing. *Huntington v. Apfel*, 101 F.Supp.2d. 384, 390 (D. Md. 2000) (citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* at 390-91. When "a fair amount of evidence exists" that a claimant meets a disability listing, but the evidence is rejected without discussion, "'insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings.'" *Coe v. Berryhill*, No. 1:15CV1077, 2017 WL 886858, at *3 (M.D.N.C. Mar. 6, 2017) (quoting *Bailey v. Colvin*, No. 1:14CV303, 2015 WL 5227646, at *3 (M.D.N.C. Sept. 8, 2015)).

Under the Listings, there are three impairments pertinent to eyesight. Listing 2.02 involves a loss of central visual acuity. Listing 2.03 addresses loss (contraction) of the visual field. Listing 2.04 considers the loss of visual efficiency, which is a formulaic determination that uses calculations of visual acuity efficiency and visual field efficiency.

The ALJ correctly considered Listing 2.02 and determined that Claimant did not meet that listing, because the corrected vision in his best eye did not satisfy the required severity criteria of 20/200 or higher. However, the ALJ erred by not examining any other listing related to Claimant's visual impairments. Claimant offered significant evidence of visual field contraction; including, a diagnosis of heteronymous hemianopia, visual field test grids showing contraction of the field in both eyes, and the testimony of Dr.

Brendemuehl that Claimant's visual field contraction was his "biggest limitation." Therefore, the ALJ clearly should have considered Listing 2.03, and, perhaps, Listing 2.04 as well. He erred by not doing so.

The Commissioner concedes that Listing 2.03 was not examined by the ALJ, but argues that Plaintiff's challenge is without merit because the evidence "contradicts a finding of listing-level or even significant constriction of Plaintiff's visual field in either eye." (ECF No. 14 at 14). In her brief in support of the disability decision, the Commissioner provides a thorough, well analyzed, and well-written review of the evidence regarding Claimant's loss of visual fields. Unfortunately, the Commissioner's brief is the first time that such an analysis was performed.  A "simple but fundamental rule of administrative law … is … that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962). The ALJ simply did not articulate any substantive analysis of Claimant's visual field loss. Moreover, when the ALJ referenced evidence related to Claimant's visual fields, he appeared to believe the evidence was relevant to Claimant's visual acuity. Indeed, if the ALJ understood the difference between the two impairments, that understanding was not made clear in the written decision. Consequently, the court cannot accept from the Commissioner an explanation for the disability determination that was not offered at any point in the administrative proceedings.

Although the Commissioner provides persuasive factual support for her contention that Claimant does not meet or equal Listing 2.03, she misses a fundamental procedural

point. In order to argue that Claimant does not meet Listing 2.03, the Commissioner is forced to interpret and weigh medical information that was not interpreted and weighed by the ALJ; challenge the reliability of diagnoses and clinical findings never challenged by the ALJ; resolve inconsistencies in the record that were not addressed by the ALJ; and contradict the ALJ's finding that the visual field grids produced by Dr. Beres corroborate Dr. Brendemuehl's testimony and Dr. Charlton's diagnosis of heteronymous hemianopia. (ECF No. 14 at 13-15). This approach by the Commissioner merely highlights the failures of the ALJ. The medical evidence in this case "is not so one-sided that one could clearly decide, **without analysis**," that Listing 2.03 is not implicated. *Brown v. Colvin*, 639 F. App'x 921, 923 (4th Cir. 2016) (emphasis added). Thus, in order for the court to accept the Commissioner's *post hoc* analysis, the court would also have to analyze, interpret, and weigh evidence; resolve discrepancies in the evidence and in the ALJ's written opinion; and weigh medical source opinions. As the Fourth Circuit has repeatedly admonished, district courts are not at liberty to engage in these tasks. *See Fox v. Colvin,* 632 F.App'x 750, 754 (4th Cir. 2015) (quoting *Radford v. Colvin,* 734 F.3d 288, 296 (4th Cir. 2013)) (finding that it is not "the province of the district court [] to engage in these [fact-finding] exercises in the first instance."). In addition, the courts may not "reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." *Hancock*, 667 F.3d 470, 472 (4th Cir. 2012) (citation omitted). Without an adequate review of the relevant evidence and an explanation as to how the ALJ determined the severity of Claimant's visual field loss, the court is unable to find that the decision is supported by substantial evidence. *See Radford,* 734 F.3d at 295 ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.").

Looking next at the RFC assessment, the undersigned **FINDS** that the ALJ's RFC finding lacks substantial evidentiary support given his failure to distinguish between Claimant's two types of visual limitation. As the written decision demonstrates, the ALJ never explicitly considered the severity or functional impact of Claimant's visual field loss. He certainly did not perform the analysis supplied by the Commissioner in her brief. Moreover, although the evidence regarding Claimant's visual field deficits is contradictory and confusing, the ALJ never attempted to reconcile the inconsistencies. The ALJ indicated that Claimant's ability to drive and play Pacman was proof that he had adjusted to his visual limitations; however, the ALJ never provided an explanation for how a loss of visual fields might affect these activities. He also cryptically explained that while he gave significant weight to Dr. Brendemuehl's opinions, at least to the extent the opinions were consistent with the RFC finding, he afforded greater weight to the state agency consultants' opinions when "giving every benefit of doubt." (Tr. at 85). This statement make little sense on its face, but is even more bewildering when considering that the state agency consultants looked only at Claimant's visual acuity, when in contrast, Dr. Brendemuehl spoke primarily about Claimant's loss of visual fields. As Claimant emphasizes, the state agency consultants were unaware of Claimant's visual field loss, as the diagnosis of heteronymous hemianopia was not made until March 2014, months after the last state agency review.

Equally as questionable is the ALJ's decision not to incorporate in Claimant's RFC finding any of the limitations identified by Dr. Brendemuehl. Evidently, the ALJ rejected the suggested limitations, because he believed that Claimant's ability to drive and play Pacman disproved their need. However, Claimant's ability to drive and play Pacman was documented in the record reviewed by Dr. Brendemuehl, and she was present during

Claimant's testimony when he reiterated that he engaged in these activities. Notwithstanding that information, Dr. Brendemuehl opined that Claimant required additional restrictions related to his loss of peripheral vision. The ALJ never addressed the obvious contradiction between his conclusion and Dr. Brendemuehl's testimony. Consequently, the ALJ's discussion does not demonstrate a resolution of the conflict.

In summary, the written decision leaves the court to question whether the ALJ fully understood and accounted for Claimant's loss of visual fields. The ALJ certainly did not "build an accurate and logical bridge from the evidence to his conclusion," *Monroe*, 826 F.3d at 189 (citation omitted), and the court is not authorized to conduct the necessary analysis. Therefore, the undersigned **FINDS** that the Commissioner's decision is not supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion for judgment on the pleadings, (ECF No. 11), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 14); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section

636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 6, 2017

Cheryl A. Eifert
United States Magistrate Judge